# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Walter M. Bash, Petitioner.

Appellate Case No. 2015-001582

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Berkeley County
Stephanie P. McDonald, Circuit Court Judge

---

Opinion No. 27692
Heard September 7, 2016 – Filed December 21, 2016

---

## REVERSED

---

Appellate Defender Susan Barber Hackett, of Columbia,
for Petitioner.

Attorney General Alan McCrory Wilson  and Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia; and Solicitor Scarlett Anne Wilson, of
Charleston; for Respondent.

---

**JUSTICE FEW:** Walter Bash was indicted for trafficking in cocaine and cocaine base.  The circuit court found officers conducted an illegal search, and suppressed

the drugs.  The State appealed.  The court of appeals reversed the circuit court's suppression order and remanded for trial.  We issued a writ of certiorari to review the court of appeals' decision.  We now reverse the court of appeals and reinstate the circuit court's order suppressing the evidence.

## I.        Facts and Procedural History

The Berkeley County Sheriff's Office drug enforcement unit received an anonymous tip that "drug activity" was occurring at a home on Nelson Ferry Road near Moncks Corner.  An unnamed officer in the drug enforcement unit relayed the tip to Sergeant Lee Holbrook, who was patrolling the area with Sergeant Kimberly Milks.  Sergeant Holbrook testified, "We were in the Moncks Corner area . . . , and one of the agents . . . received . . . a phone call stating that there was drug activity at a particular residence, and we . . . drove over there and handled it."

He explained that as they located the house they noticed some men "behind the house in a grassy area."  To get to the grassy area, Sergeant Holbrook turned his vehicle off Nelson Ferry Road onto a public dirt road called Shine Bash Lane that ran along the side of the property where the house was located.  Sergeant Holbrook testified, "As we travelled down . . . Shine Bash, there were several [men] standing . . . by this little shed, and there was a pickup truck pulled in onto the grass area."  The "small utility shed" was just outside a fence surrounding the home.  Sergeant Milks testified "as we go down Shine Bash Lane, there's a tree that you can see through [into] the yard" where she saw a pickup truck and three men.  The officers pulled off of Shine Bash Lane onto the property, approximately twenty feet from the grassy area where the men were standing.

The officers exited the car to talk to the men.  Sergeant Milks testified there were two men by a grill and a third man at the back of the truck.  Sergeant Holbrook testified one of the men "thr[ew] down . . . what appeared to be cocaine," and "almost instantly" afterward, a fourth man opened the passenger door of the truck and ran into the nearby woods.  Sergeant Milks and several other officers chased the man while Sergeant Holbrook detained the men remaining in the grassy area.  This group included Bash, who got out of the driver's side of the truck.  After detaining the men, Sergeant Holbrook looked through the window of Bash's truck to see "if there [were] other individuals in that truck hiding."  He saw "in plain view what appeared to be cocaine weighing scales" and "cocaine base."  Sergeant Holbrook arrested Bash.  A grand jury subsequently indicted him for trafficking

19

"four hundred grams or more" of cocaine in violation of subsection 44-53-370(e)(2)(e) of the South Carolina Code (Supp. 2016), and trafficking "ten grams or more, but less than twenty-eight grams" of cocaine base in violation of subsection 44-53-375(C)(1) of the South Carolina Code (Supp. 2016).

Prior to trial, Bash moved to suppress the drugs. He argued the police violated the Fourth Amendment of the United States Constitution by entering the curtilage of the home without a warrant to conduct a search. The circuit court granted Bash's motion. The court of appeals reversed the circuit court's decision to suppress the evidence. *State v. Bash*, 412 S.C. 420, 772 S.E.2d 537 (Ct. App. 2015). We granted Bash's petition for certiorari.

## II. Fourth Amendment

The people's right under the Fourth Amendment to "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. CONST. amend. IV, "extends . . . to . . . the curtilage of the home," *State v. Herring*, 387 S.C. 201, 209, 692 S.E.2d 490, 494 (2009) (citing *United States v. Dunn,* 480 U.S. 294, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987) and *Rogers v. Pendleton,* 249 F.3d 279, 287 (4th Cir. 2001)). "Warrantless searches and seizures are unreasonable absent a recognized exception to the warrant requirement." *State v. Wright*, 391 S.C. 436, 442, 706 S.E.2d 324, 327 (2011) (citing *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290, 298-99 (1978)).

"On appeals from a motion to suppress based on Fourth Amendment grounds, . . . this Court reviews questions of law de novo." *State v. Adams*, 409 S.C. 641, 647, 763 S.E.2d 341, 344 (2014). As to a circuit court's finding of fact, we must affirm "if there is any evidence to support it," and "may reverse only for clear error." *State v. Brown*, 401 S.C. 82, 87, 736 S.E.2d 263, 265 (2012).

## III. Curtilage

The circuit court ruled the grassy area where Bash and the other men were standing when the officers approached them was part of the curtilage of the home.[1] The

---

[1] The court of appeals stated "it is unclear whether the circuit court ruled on whether the grassy area at issue was part of the curtilage." 412 S.C. at 425 n.4, 772 S.E.2d at 540 n.4. We disagree that the ruling is unclear. Preliminary to its ruling,

20

curtilage of a home is "the land immediately surrounding and associated with the home" and is "part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742, 80 L. Ed. 2d 214, 225 (1984). As we have stated, curtilage can include "outbuildings, yard around dwelling, garden." *State v. Wiggins*, 330 S.C. 538, 548 n.15, 500 S.E.2d 489, 494 n.15 (1998) (discussing curtilage in the context of the duty to retreat under the law of self-defense (citing 40 Am. Jur. 2d *Homicide* § 168 (1968))); *see also* 79 C.J.S. *Searches* § 34 (2006) ("The curtilage is defined by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. It is the area to which extends the intimate activity associated with the sanctity of a person's home and the privacies of life. The primary focus is whether the area harbors those intimate activities associated with domestic life and the privacies of the home." (footnotes omitted)).

We find there is evidence in the record to support the circuit court's determination that the grassy area was within the curtilage of the home. First, both Sergeant Holbrook and Sergeant Milks described the grassy area as part of the "backyard" or "yard area." The grassy area included a grill, and Sergeant Milks testified that when she got out of the vehicle she "saw the two [men] over by the grill." The use of a grill is an activity closely associated with the use of a home.[2] The area also included a shed, and the area was located only a few feet from a fence surrounding the home. In the short distance between the fence and the grassy area, there was a

---

the circuit court engaged in extensive discussion with counsel about the legal concept of curtilage and the facts in the record relating to those principles. Then, explaining its ruling, the circuit court stated the officers "suited up and went into the curtilage of this . . . house based on an anonymous tip alone."

[2] *See United States v. Burston*, 806 F.3d 1123, 1127 (8th Cir. 2015) (finding the presence of a cooking grill indicated the resident "made personal use of the area," and thus the grill was one fact supporting a determination the area was part of the curtilage); *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 652 (6th Cir. 2006) (noting the fact the defendants "frequently kept a grill" on their porch as supporting the existence of the area as part of the curtilage).

clothes line.[3]  Additionally, Shine Bash Lane—though a public road—is a short dirt road that reaches only a few residences.  It runs very close to the home and comes to a dead end on the property where the home sits.  Large trees line the side of the road between Shine Bash Lane and the home.  These trees continue past the shed and partially block sight from the road to the grassy area where the men were standing.  Sergeant Milks testified she had to look through a tree to see into the yard from Shine Bash Lane.[4]  Finally, the circuit court had before it numerous photographs showing the house, the yard, and the extent to which the grassy area was connected to the home and concealed from public view.

The State points out the Supreme Court of the United States has identified four factors courts should consider in deciding whether an area is part of the curtilage of a home, citing *Dunn*, 480 U.S. at 301, 107 S. Ct. at 1139, 94 L. Ed. 2d at 334-35.  The *Dunn* court stated:

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.*  The State argues "the circuit court judge did not appear to have considered *any* of the factors."  However, the record indicates the circuit court was aware of and did consider *Dunn*.  Near the end of the hearing, the State cited *Dunn* and offered

[3] *See United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (finding the defendants using the area "for such things as hanging their wet laundry on a clothesline to dry" was one fact supporting a finding the area was curtilage).

[4] *See United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001) ("[I]n rural pieces of property . . . , natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.'" (citation omitted)).

22

to provide a copy of it to the court.  The circuit court immediately responded, "I have it."

In *Dunn*, the Supreme Court stated "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  480 U.S. at 301, 107 S. Ct. at 1140, 94 L. Ed. 2d at 335; *see also United States v. Jackson*, 728 F.3d 367, 373-74 (4th Cir. 2013) (stating the Supreme Court "cautioned" for the limited use of the *Dunn* factors).  While the circuit court should have made findings as to the *Dunn* factors,[5] we find the court's analysis was properly focused on the "centrally relevant consideration" the Supreme Court identified in *Dunn*.

We find the circuit court correctly applied the applicable principles of law regarding curtilage, and the evidence supports the court's factual finding that the grassy area in the backyard was sufficiently tied to the home to be within the curtilage.  Therefore, we affirm the circuit court's finding the area where the officers encountered Bash was within the curtilage of the home.

## IV. Search

A law enforcement officer must have a warrant to enter a home for the purpose of conducting a search, *see State v. Counts*, 413 S.C. 153, 163, 776 S.E.2d 59, 65 (2015) (stating "the Fourth Amendment requires the police to have a warrant in order to conduct a search"), unless an exception applies, *see State v. Brown*, 401 S.C. 82, 89, 736 S.E.2d 263, 266 (2012) (listing exceptions to the warrant requirement).  *See generally State v. Robinson*, 410 S.C. 519, 526, 765 S.E.2d 564, 568 (2014) (stating "warrantless searches and seizures inside a man's home are

---

[5] After reciting the four factors, the *Dunn* Court engaged in an extensive analysis of them.  480 U.S. at 302-03, 107 S. Ct. at 1140, 94 L. Ed. 2d at 335-36.  In this case, however, the State never requested the circuit court to make findings as to the *Dunn* factors, and the State did not object to the circuit court's failure to do so.  Thus, we question whether any error in the lack of findings on the *Dunn* factors is preserved for our review.  *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003) ("In order for an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge.").

presumptively unreasonable absent a recognized exception to the warrant requirement").  This protection "extends . . . to . . . the curtilage of the home." *Herring*, 387 S.C. at 209, 692 S.E.2d at 494; *see also Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 192 (4th Cir. 2015) ("The Fourth Amendment protects homes and the 'land immediately surrounding and associated' with homes, known as curtilage . . . ." (quoting *Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742, 80 L. Ed. 2d at 225).  The circuit court determined the officers in this case entered the curtilage for the purpose of conducting a search, and thus violated the Fourth Amendment because they did not have a warrant and no exception applied.

When officers "physically occup[y] private property for the purpose of obtaining information," a search has occurred.  *United States v. Jones,* 565 U.S. ___, ___, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911, 918 (2012).  The majority in *Jones* explained:

> Whatever new methods of investigation may be devised, our task, *at a minimum,* is to decide whether the action in question would have constituted a "search" within the original meaning of the Fourth Amendment.  Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred.

565 U.S. at ___ n.3, 132 S. Ct. at 950–951 n.3, 181 L. Ed. 2d at 919 n.3; *see also* 565 U.S. at ___, 132 S. Ct. at 954, 181 L. Ed. 2d at 923 (Sotomayor, J., concurring) ("I join the Court's opinion because I agree that a search within the meaning of the Fourth Amendment occurs, at a minimum, '[w]here, as here, the Government obtains information by physically intruding on a constitutionally protected area.'"); *United States v. DE L'Isle*, 825 F.3d 426, 431 (8th Cir. 2016) ("It is clear that a physical intrusion or trespass by a government official constitutes a search within the meaning of the Fourth Amendment."); *United States v. Perea-Rey*, 680 F.3d 1179, 1185 (9th Cir. 2012) ("Warrantless trespasses by the government into the home or its curtilage are Fourth Amendment searches."). *Cf. Jackson*, 728 F.3d at 373 (affirming "the district court's conclusion that the officers' actions did not involve an unlicensed physical intrusion of a constitutionally protected area" and thus was not "an illegal search or seizure" and noting "if [the officers] breached the curtilage of Cox's apartment . . . , it would be fairly clear that their actions . . . would implicate the protections of the Fourth Amendment").

In this case, after receiving an anonymous tip indicating illegal activity was occurring at the home, the officers "drove over there and handled it." Sergeant Holbrook told Sergeant Milks, "Hey, let's go . . . we need to check out this drug tip that we got." On their way, they radioed other officers to meet them there, and they arrived at the home with other officers in cars behind them. Sergeant Milks testified that on their way, "We put on our vests, our hat . . . that we wear that says 'Sheriff' on it; a vest that says 'Sheriff' on it." Later, when applying for a warrant to search the home, Sergeant Milks signed an affidavit stating, "Members of the Berkeley County drug enforcement unit were investigating a suspicious complaint at . . . Nelson Ferry Road . . . ." When Sergeant Holbrook was asked, "What was your reason for pulling on to the grass?" he responded,

> I . . . received a tip that there was some type of active drug activity going on at that time. As I approached the house, I didn't see anybody around it, and that just caught my attention. So, I just simply drove back there, and that activity was supposed to be happening in the . . . rear of the property, so that was my reasoning . . . I just didn't feel the need to actually make contact with the actual house. I just went down Shine Bash Lane.

Based on this evidence, the circuit court found the officers conducted a search. The court stated the Fourth Amendment does not "allow you to roll up in somebody's backyard when your sole purpose for going there is to search it." The court then ruled:

> [The officers] roll[ed] up in the backyard solely to search for drugs. And there's no reasonable interpretation of the officers' testimony other than that's why they were there. They were not there to politely ask the homeowner, Hey, are you selling drugs out of your house? They were there to see if they could find any.

The State contends that the officers did not conduct a search, but entered the property simply to conduct a "knock and talk." The court of appeals accepted the State's argument. *Bash*, 412 S.C. at 428, 772 S.E.2d at 541. A knock and talk "occurs when a law enforcement officer . . . approaches a residence by a route

25

available to the general public, knocks on the front door of the residence, and speaks with an occupant of the residence who responds to the knocking." 68 Am. Jur. 2d *Searches and Seizures* § 21 (2010).[6] A knock and talk is not a search under the Fourth Amendment. *State v. Counts*, 413 S.C. 153, 164-65, 776 S.E.2d 59, 66 (2015) (discussing the knock-and-talk procedure in detail); *see also United States v. Walker*, 799 F.3d 1361, 1364 n.1 (11th Cir. 2015) (stating "a warrantless . . . knock and talk . . . is not considered a search"); *Rogers v. Pendleton*, 249 F.3d 279, 289–90 (4th Cir. 2001) ("[P]olice officers do not need a warrant to do what any private citizen may legitimately do—approach a home to speak to the inhabitants.").

We agree with the circuit court the officers conducted a search of the grassy area, not a knock and talk. First, Sergeant Holbrook testified, "So instead of actually approaching the house and conducting a knock and talk investigation, we just simply drove toward the backyard." Second, and more importantly, all of the circumstances surrounding the officers' entry into the grassy area objectively demonstrate their purpose was to conduct a search of the grassy area, not to speak to the homeowner. Sergeants Milks and Holbrook (1) radioed other officers to meet them at the home, (2) put on gear indicating they were with the sheriff's office, (3) arrived at the home with other officers in cars behind them, and (4) bypassed the front of the home. Further—in their testimony and in Milks' affidavit—Sergeants Milks and Holbrook gave no indication they were approaching the home in order to speak to the homeowner.

In finding the officers conducted a search—not a knock and talk—the circuit court relied in part on *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013). The issue in *Jardines* was "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." ___ U.S. at ___, 133 S. Ct. at 1413, 185 L. Ed. 2d at 499; *see also* ___ U.S. at ___, 133 S. Ct. at 1414, 185 L. Ed. 2d at 500 ("We granted certiorari, limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment."). Quoting *Jones*, the

---

[6] *See also Bash*, 412 S.C. at 424-25 n.2, 772 S.E.2d at 539 n.2 ("A knock and talk ... is a procedure used by police officers to investigate a complaint where there is no probable cause for a search warrant. The police officers knock on the door, try to make contact with persons inside, and talk to them about the subject of the complaints." (quoting *State v. Dorsey,* 762 S.E.2d 584, 588 n.6 (W. Va. 2014))).

Supreme Court set forth what it called the "simple baseline" of Fourth Amendment protections: "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" ___ U.S. at ___, 133 S. Ct. at 1414, 185 L. Ed. 2d at 500.  After finding "the officers' investigation took place in a constitutionally protected area"—the curtilage—the Supreme Court "turn[ed] to the question of whether [the investigation] was accomplished through an unlicensed physical intrusion." ___ U.S. at ___, 133 S. Ct. at 1415, 185 L. Ed. 2d at 501-02.

In answering that question, the Supreme Court discussed the implied license any person holds to approach the front door of a home, and knock, and talk.

> "A license may be implied from the habits of the country," . . . .  We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds."  This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.  Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.  Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

___ U.S. at ___, 133 S. Ct. at 1415-16, 185 L. Ed. 2d at 502 (footnote omitted) (first quoting *McKee v. Gratz,* 260 U.S. 127, 136, 43 S. Ct. 16, 17, 67 L. Ed. 167, 170 (1922); then quoting *Breard v. Alexandria,* 341 U.S. 622, 626, 71 S. Ct. 920, 924, 95 L. Ed. 1233, 1239 (1951); and then quoting *Kentucky v. King,* 563 U.S. 452, 469, 131 S. Ct. 1849, 1862, 179 L. Ed. 2d 865, 881 (2011)).

The Supreme Court then referred back to "the question before the court"— "whether the officers' conduct was [a] . . . search"—and stated:

27

> As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered. Here, their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do.

___ U.S. at ___, 133 S. Ct. at 1416-17, 185 L. Ed. 2d at 503.

Relying on this reasoning from *Jardines*, the circuit court in this case found the officers' behavior revealed a purpose to conduct a search. The court specifically found, "They were not there to [talk to] the homeowner." Going to the front door of a home for the purpose of speaking to the homeowner is not an "intrusion" because of the implied license to do what any private citizen might do. *See Rogers*, 249 F.3d at 289–90 (stating "police officers do not need a warrant to do what any private citizen may legitimately do—approach a home to speak to the inhabitants"); *Wright*, 391 S.C. at 444, 706 S.E.2d at 328 (stating, "A policeman may lawfully go to a person's home" and "go up to the door"). Rather, the circuit court found the officers were there "to see if they could find any [drugs]," a mission no homeowner licenses a police officer to enter their private property to undertake. *See Jardines*, ___ U.S. at ___, 133 S. Ct. at 1416, 185 L. Ed. 2d at 502-03. Thus, the circuit court found the officers in this case had no license to enter the grassy area, and therefore when they did so they physically intruded onto private property to conduct a search—not a knock and talk. Because no exception to the warrant requirement applied and there was no warrant, the officers violated the Fourth Amendment.

As *Jardines* makes clear, the circuit court was correct to focus on the purpose of the officers' actions. As we have explained, the officers' behavior in this case demonstrates objectively the purpose of searching for drugs. We also note the officers' subjective intent is consistent with their objective purpose. Sergeant Holbrook testified that "instead of actually approaching the house and conducting a knock and talk investigation, we just simply drove toward the backyard." Sergeant Milks said the same thing in her affidavit, they "were investigating a suspicious complaint," not looking for the homeowner.

The court of appeals found the circuit court erred by relying on the officers' intent. *See Bash*, 412 S.C. at 430-31, 772 S.E.2d at 542-43 ("We conclude the circuit

28

court's injection of the officers' subjective intent into its analysis was an error of law."). We find the circuit court did not err. While even this court has made statements to the effect that the subjective intent of the officer is irrelevant,[7] that principle of law does not apply to the question of *whether* officers conducted a search. The Supreme Court explained in *Jardines*:

> The State points to our decisions holding that the subjective intent of the officer is irrelevant. But those cases merely hold that a stop or search *that is objectively reasonable* is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason.

___ U.S. at ___, 133 S. Ct. at 1416, 185 L. Ed. 2d at 503.

Thus, when an officer's *actions* are objectively reasonable under the Fourth Amendment, the officer's subjective *intent* to the contrary will not invalidate the officer's actions. Here, the officers' subjective intent to conduct a search for drugs is consistent with the circuit court's finding regarding their objective purpose.

The court of appeals also relied on *Wright* to support its conclusion the officers in this case did not conduct a search. Quoting *Wright*, the court of appeals stated, "A police officer without a warrant is privileged to enter private property to investigate a complaint or a report of an ongoing crime." *Bash*, 412 S.C. at 426–27, 772 S.E.2d at 540 (quoting *Wright*, 391 S.C. at 444, 706 S.E.2d at 328). The quoted statement from *Wright*—applicable there—is not applicable here. The key distinction between this case and *Wright* is the officers in *Wright* had probable cause to believe a crime was in progress *before* they departed their path to the front door, and immediately thereafter, they observed exigent circumstances to excuse

---

[7] *See, e.g.*, *State v. Moore*, 415 S.C. 245, 252, 781 S.E.2d 897, 901 (2016) (regarding an officer's justification for extending a traffic stop); *State v. Provet*, 405 S.C. 101, 108, 747 S.E.2d 453, 457 (2013) (regarding the existence of reasonable suspicion); *Wright*, 391 S.C. at 444, 706 S.E.2d at 328 (regarding the existence of exigent circumstances); *State v. Banda*, 371 S.C. 245, 252 n.3, 639 S.E.2d 36, 40 n.3 (2006) (regarding the existence of reasonable suspicion or probable cause); *State v. Freiburger*, 366 S.C. 125, 133, 620 S.E.2d 737, 741 (2005) (regarding the validity of a search incident to arrest).

the warrant requirement. From a public road, the officers in *Wright* "observed a large number of vehicles . . . and saw spotlights." 391 S.C. at 445, 706 S.E.2d at 328. The officers then turned down the private dirt road on their way to the front door. *Id.* We explained:

> The deputies' observations as they drove down the dirt road corroborated the anonymous tip and gave them ample reason to believe dogfighting was in progress. Exigent circumstances developed when the suspects started fleeing. Moreover, the presence of dogs created a potential danger to the deputies. Hence, the deputies had the authority to perform a protective sweep of the premises.

391 S.C. at 445, 706 S.E.2d at 328.

The officers in *Wright*, therefore, observed facts that gave rise to probable cause to believe a crime was in progress—before they "physically intrud[ed]" onto private property—and the exigent circumstances exception to the warrant requirement permitted them to proceed without a warrant. *See Herring*, 387 S.C. at 210, 692 S.E.2d at 494 ("A fairly perceived need to act on the spot may justify entry and search under the exigent circumstances exception to the warrant requirement."). In this case, on the other hand, Sergeants Holbrook and Milks observed nothing incriminating—and therefore did not have probable cause for a search—until *after* they drove onto the grassy area and saw one of the men throw down what appeared to be cocaine.

The court of appeals also stated "the Fourth Circuit has adopted the position police may bypass the front door of a residence and proceed to the backyard or other entrance for a knock and talk provided they have reason to believe the person they are attempting to contact will be found there." *Bash*, 412 S.C. at 428, 772 S.E.2d at 541. For this statement, the court of appeals cited *Alvarez v. Montgomery County*, 147 F.3d 354 (4th Cir. 1998). *Id.* However, *Alvarez* does not support the court of appeals' conclusion the officers in this case acted within the Fourth Amendment. The facts of *Alvarez*—quite different from the facts of this case—led the Fourth Circuit to this basic conclusion: "the officers in this case had a 'legitimate reason' for entering the Alvarezes' property 'unconnected with a search of such premises.'" 147 F.3d at 358. Those facts included (1) the officers "were

30

responding to a 911 call;" (2) "about an underage drinking party;" (3) where the officers found "alcohol containers and . . . awkwardly parked cars;" (4) which caused them to "believe[] they had found the party." *Id.* Also unlike this case, the officers actually approached the front door of the Alvarezes' home. 147 F.3d at 357. When they did so, they observed a sign that read "Party In Back" with "an arrow pointing toward the backyard." *Id.* Following the sign's directive, the officers "entered the backyard." *Id.* The Fourth Circuit specifically found the officers did not enter the backyard for the purpose of conducting a search, but rather, "They entered the Alvarezes' property simply to notify the homeowner or the party's host about the complaint and to ask that no one drive while intoxicated." 147 F.3d at 358.

The circuit court in this case found that Sergeants Holbrook and Milks and an unknown number of other officers entered the grassy area behind this home not simply to speak with the homeowner about the complaint, but rather for the purpose of searching for drugs. In making these findings, the circuit court correctly applied the applicable principles of law. As to the circuit court's factual findings, there is ample evidence in the record to support them. Therefore, the court of appeals erred in reversing the circuit court's finding that a search occurred.

## V.    Conclusion

The officers entered the curtilage of this home for the purpose of conducting a search for drugs. These actions implicate the Fourth Amendment. Because the officers did not have a warrant for the search and no exception to the warrant requirement was applicable, the officers violated the Fourth Amendment's prohibition against unreasonable searches and seizures. For this reason, we **REVERSE** the court of appeals,[8] and we reinstate the circuit court's order suppressing the drugs.

**PLEICONES, C.J., BEATTY, KITTREDGE, JJ., and Acting Justice DeAndrea Benjamin, concur.**

---

[8] We also granted certiorari to determine whether the police violated article I, section 10 of the South Carolina Constitution by entering the backyard of the home. We need not reach this issue because we affirm the circuit court's ruling suppressing the evidence under the Fourth Amendment. *State v. Gamble*, 405 S.C. 409, 420, 747 S.E.2d 784, 789 (2013).